UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
ARS ANALYTICAL, LLC,
     Debtor.                       No. 11-10-10373 SA

**MEMORANDUM OPINION ON ASSAIGAI
ANALYTICAL LABORATORIES, INC.'S
<u>MOTION TO DISMISS AND MOTION TO CONVERT</u>**

This matter came before the Court on June 24, 2010, July 1, 2010 and July 2, 2010 for final hearing on the Motion to Dismiss (doc 49) and Motion to Convert Case (doc 47) filed by Assaigai Analytical Laboratories, Inc. ("Assaigai"), and the objections thereto filed by ARS Analytical, LLC ("Debtor" and sometimes "Buyer")(doc 58) and American Radiation Services, Inc. ("ARSI")(doc 57).  Assaigai appeared through its attorneys Thuma & Walker, P.C. (David T. Thuma) and the Law Office of Marcus Garcia (Marcus Garcia).  Debtor appeared through its attorney Moore, Berkson & Gandarilla, P.C. (Bonnie Gandarilla).  ARSI appeared through its attorney Paul M. Kienzle, III.  This is a core proceeding concerning administration of the estate.  28 U.S.C. § 157(b)(2)(A).  For the reasons set forth below, the Court finds that the case should be converted to Chapter 7.

**<u>FACTS</u>**

Pinnacle Laboratories, Inc. ("Pinnacle") filed a Chapter 11 petition in this Court on January 30, 2008.  (Case No. 11-08-10239 SA).  Pinnacle was a commercial laboratory located at 2709-D Pan American Freeway, NE, Albuquerque, New Mexico.  On June 19,

2008, the Court granted a contested motion to convert Pinnacle to
chapter 7 (doc 111) and Linda S. Bloom was appointed Chapter 7
trustee (doc 112).  On July 17, 2008 the Trustee, as seller, and
Dr. Mitchell Rubenstein and Phyllis Rubenstein, as proposed
purchasers, filed a Joint Motion to sell assets of the Pinnacle
estate free and clear of liens pursuant to section 363(b)(1).
(Doc 128).  The Rubensteins were Pinnacle's shareholders.  (Id.)
Several objections to the sale were filed.  At an August 19, 2008
hearing the Court entered an Order authorizing the Trustee to
conduct an auction on September 15, 2008.  (Doc 155).  The
Trustee conducted the auction on September 15, 2008 and submitted
a stipulated order approving the sale which was filed on
September 23, 2008.  (Doc 167).  ARSI was the successful bidder
at $21,000.00.  (Id. ¶ 3).

    ARSI is a certified government contractor located in Port
Allen, Louisiana with other offices in Knoxville, Tennessee and
White Rock, New Mexico.  Its website claims:

> Since 1993, ARS International has provided technicians,
> chemists, safety professionals and field personnel to
> the oil and gas industry as well as the federal
> government.  When it comes to radiological testing, we
> have one of the most experienced teams in the country.
> Our staff is made up of highly trained personnel who
> use the world's most advanced high-performance
> analytical instrumentation to provide quality data
> quickly and economically.  Our safety officers and
> field personnel are technically skilled and
> knowledgeable of all regulatory issues.

http://www.amrad.com/.

As of June, 2008, ARSI already had an office in White Rock, New Mexico equipped with new equipment. White Rock is near Los Alamos, the home of Los Alamos National Laboratories ("LANL").

ARSI purchased the Pinnacle equipment and operated a lab out of Pinnacle's premises. ARSI's intent was to bring up the Albuquerque facility to be like White Rock's.

ARSI formed Debtor on March 27, 2009 as a New Mexico domestic limited liability company. <u>See</u> http://www.nmprc.state.nm.us/cii.htm . It listed its principal address as 4301 Masthead NE, Suite A, Albuquerque, New Mexico. <u>Id.</u> Its registered agent was Elvin J. Chavez. <u>Id.</u>[1] ARSI anticipated Debtor obtaining contracts with LANL.

ARSI owns 80% of the interest in Debtor. The other 20% is owned by Elvin J. Chavez. (Doc 4). Daryl DeArmand is the Chief Operating Officer of both Debtor and ARSI. Danny Coleman is the Chief Executive Officer of both Debtor and ARSI. Elvin J. Chavez was President of Debtor until he resigned in March or April, 2010. There are no other officers of Debtor. Neither DeArmand or Coleman are paid a salary by Debtor. DeArmand lives in Baton Rouge, Louisiana but travels to Albuquerque about once a month. Coleman also lives in Louisiana. DeArmand thinks that Coleman has been to Albuquerque, but he is not certain.

---

[1]These facts were also testified to at trial.

Page -3-

After Debtor was formed, Debtor and Assaigai were in contact regarding the purchase of Assaigai's state-of-the-art laboratory located at 4301 Masthead NE, Albuquerque, New Mexico[2].  On June 10, 2009 (but effective as of June 15, 2009) Assaigai as "Seller" and Debtor as "Buyer" entered an Asset Purchase Agreement ("Agreement").  Exh. 1.

The Agreement recites as follows (Exh. 1, pp. 1-2.):  Seller owns an analytical laboratory business that is located in leased premises at the Masthead address.  ARSI (as parent company to Debtor) has formed the Debtor/Buyer as a limited liability company that will perform chemical and analytical services ("C&A Services").  ARSI wishes to become a full service environmental laboratory, which requires C&A Services.  ARSI currently performs C&A Services in Louisiana and performs field and analytical services ("F&A Services")[3] in White Rock for certain clients.  Except as specified, Seller acknowledges that the transactions in the Agreement are between Seller and Buyer, and the Seller

---

[2]There is a discrepancy in the evidence on this point. Debtor's Chief Operating Officer, Daryl DeArmand, testified that after Debtor was formed Assaigai approached it to purchase the lab.  In contrast, William P. Biava, Assagai's president, testified that ARSI approached Assaigai to purchase the lab. However, the LLC formation documents lists Assaigai's address as its principal place of business (it is possible that the place of business was amended after the initial filing).  None of these observations are really material to the issues under consideration.

[3]F&A Services do not include C&A Services.  Exh. 1, ¶ 1.1.24.

Page -4-

acknowledges that ARSI as parent company is not responsible and does not assume and/or guarantee any of the obligations of the Buyer.  In order to provide C&A Services, Buyer needs 1) assets, 2) corporate counseling, 3) non-compete and non-solicitation agreements, and 4) a real property sub-lease for ARSI's business premises.  In order for Seller to continue providing F&A Services, it will retain certain assets and needs 1) assets for it to continue providing F&A Services, 2) non-compete and non-solicitation agreements, 3) the ability to remain in certain portions of the Masthead address and/or use of certain lab facilities and equipment for a period of no more than seven months following the date of the Agreement in order to have sufficient time to relocate its business, and 4) in the case of Buyer's breach, Seller may reenter the market for C&A Services.

The Agreement's Article II sets out the terms of the C&A Asset acquisition.  Paragraph 2.1 states that on the Closing Date[4] Seller shall sell and Buyer shall buy all of Seller's rights, title and interest in and to certain assets utilized in providing C&A Services (described elsewhere) but specifically omitting the "Excluded Assets" (described elsewhere).  The purchase price is $2,908,317.00.  Exh. 1, ¶ 2.2.  The payment of the purchase price consists of a promissory note in the amount of

_____

[4]Defined as the date and time at which the closing actually occurs, but not later than June 10, 2009.  Agreement ¶ 3.1(a).

$750,000 (to be paid pursuant to ¶ 2.6) and the balance of $2,158,317.00 to be payable over a ten year term pursuant to a consulting agreement (¶ 2.7). Paragraph 2.6 states that Seller requires an initial lump sum payment of $750,000.00 to enable Seller to pay off a creditor to release liens on the equipment being sold. Buyer, on the other hand, requires that the initial lump sum payment of $750,000.00 be financed by Seller over a period of seven months, with the last instalment payment due December 15, 2009. Upon payment of the $750,000.00 in full, Seller will obtain releases of liens and transfer all right, title and interest to Buyer at the Post Closing free of liens. A promissory note was apparently attached to the Agreement as "Exhibit 3.0", but was not included by the parties as an attachment to Exhibit 1. From the testimony presented the Court finds that the promissory note called for six monthly payments of $10,000.00 and a $690,000.00 balloon payment by December 15, 2009. Paragraph 2.9 clarifies that at closing the Seller sells all right, title and interest in the C&A Assets subject to the claims and liens of a certain creditor; upon payment of the $750,000.00 Seller will obtain releases of those claims and liens and will then convey all right, title and interest in the C&A Assets to Buyer within ten business days free of the claims and liens.

The Agreement's Article III sets out the terms of what was expected to occur on the Closing Date and Post Closing Date[5]. Paragraph 3.2 provides that at Closing, Seller, YOME[6], and the Biavas will deliver specific items identified in ¶ 7.1. Paragraph 7.1 lists the following: (a) non-compete agreements for the Biavas and Seller, (b) Seller's corporate resolution, (c) sub-lease assignment, (d) motor vehicle certificates of title for any motor vehicles included in the C&A Assets and a Bill of Sale for each vehicle (unsigned; to be signed at Post Closing), (e) the Promissory Note, (f) YOME Corporate Consulting Agreement, and (g) such other instruments and documents as Buyer may reasonably deem necessary. Paragraph 3.3 provides that at Post Closing, Seller will deliver specific items identified in ¶ 7.2. Paragraph 7.2 lists the following: (a) a Bill of Sale and Assignment conveying all C&A Assets, (b) an Affidavit of Title, (c) any novated/assigned contracts, (d) signed motor vehicle certificates of title and Bills of Sale and (e) such other instruments and documents as Buyer may reasonably deem necessary. Paragraph 3.4 provides that at Closing, Buyer, ARSI and

---

[5]"Post Closing Date" is defined as December 15, 2009. Exh. 1, ¶ 1.1.19.

[6]The Biavas, owners of Assaigai, organized YOME Consulting Services, Inc. ("YOME") ostensibly to provide C&A Services to Buyer for a period of ten years with all payments to be credited toward the Purchase Price.

Case 10-10373-s7    Doc 81    Filed 07/21/10    Entered 07/21/10 13:50:38 Page 7 of 35

Buyer/ARSI's "Key Employees"[7] will deliver specific items
identified in ¶ 7.3.  Paragraph 7.3 lists the following: (a) the
purchase price as provided in ¶ 2.3, (b) non-compete agreements
from Buyer, ARSI, and the Key Employees, (c) sub-lease agreement,
(d) Promissory Note, (e) Corporate Consulting Agreement, (f)
Buyer's corporate resolution and (g) such other instruments and
documents as Seller may reasonably deem necessary.  Paragraph 3.5
provides that at Post Closing, Buyer will deliver specific items
identified in ¶ 7.4.  Paragraph 7.4 lists the following: (a) any
novated/assigned contracts and (b) such other instruments and
documents as Seller may reasonably deem necessary.

The Agreement's Article VI sets out the terms for the
conduct of business from the pre-effective date of the Agreement
to Post Closing.  Paragraph 6.1 deals with the pre-effective
period and is not relevant.  Paragraph 6.2 describes how the
parties will conduct their businesses in the shared premises
using shared assets from Closing until the Post Closing date.
Subparagraph (a) lists employees to be retained by Seller and
allows Buyer to hire any employee not retained.  Subparagraph (b)
states that Buyer is responsible for all expenses arising from
use of the C&A Assets and the business premises after the
Effective Date.  Seller will also invoice Buyer by the fifth day

---

[7]Designated as Elvin Chavez and Danny Coleman in Agreement ¶
2.5(e).

of the following month for any charges Buyer has incurred.
Subparagraph (c) requires Buyer to account to Seller for all
revenue invoiced and received from use of the C&A Assets by the
fifth day of the following month. Subparagraph (d) states that
Seller retains legal title to the C&A Assets pending payment in
full of the $750,000.00 down payment but that Buyer has
possession and use of those assets. Subparagraph (e) states that
Seller allows Buyer to use the assets pending Post Closing.
Subparagraph (f) governs Buyer's business during the interim
period. Buyer will conduct its business in a normal and regular
manner and may enter into any contracts without the consent of
Seller. Buyer will use its best efforts to preserve all existing
business relationships with Seller's suppliers, subcontractors,
and others having business relationships with Seller. Buyer will
use its best efforts to obtain customers and preserve existing
customer relationships. Agreement ¶ 6.3 provides that the
parties will cooperate by delivering necessary documents and in
furnishing information, evidence, testimony or other assistance
in connection with any actions or disputes of any nature for
periods preceding Closing.

Other relevant provisions of the Agreement are as follows:
Paragraph 11.5 provides that neither party shall have the right
to terminate the Agreement, Promissory Note, the Sublease, or the
Corporate Consulting Agreement after Closing. Paragraph 12.1 has

an integration clause. Paragraph 12.7 states that the Agreement will be governed by New Mexico law. Paragraph 12.11 provides for prevailing party attorney's fees, costs and expenses. Paragraph 12.17 states that time is of the essence in the performance of all obligations in the Agreement. Paragraph 12.9 requires arbitration of all disputes arising out of or relating to the Agreement, the Sublease, the Promissory Note, the Corporate Consulting Agreement, and the Non-compete Agreements[8].

On June 12, 2009 Debtor executed a Promissory Note to ARSI in the principal amount of up to $1.2 million to evidence a revolving line of credit. Interest accrues at 6% on a 365/360 basis. The Promissory Note is due upon demand, but otherwise to be paid in monthly payments of interest only until June 11, 2010, when the entire principal plus interest is due. There is no penalty for prepayment. A late fee of 5.00% of the unpaid portion of any regularly scheduled payment or $50.00, whichever is greater, is assessed if any payment is not paid within 15 days of its due date. The Promissory Note calls for different rates of interest depending on the outstanding balance in the event of default. It also calls for attorney's fees and costs in an amount not to exceed 20.00% of the principal balance. (Debtor's

---

[8]The Court finds that Debtor's bankruptcy and specifically the Motion to Convert or Dismiss are not disputes arising out of or relating to the Agreement, the Sublease, the Promissory Note, the Corporate Consulting Agreement, and the Non-compete Agreements.

Page -10-

Exh. B).  The evidence before the Court did not show the amount advanced on this line of credit.

On June 12, 2009 Debtor also executed a Security Agreement in favor of ARSI to secure the line of credit.  The collateral is described as: 1) all accounts receivable owed to or belonging to Debtor, and 2) all laboratory equipment and business furniture, fixtures and equipment owned or subsequently acquired by the Debtor. (Debtor's Exh. A).  ARSI filed a financing statement regarding the transactions in Exhibits A and B with the New Mexico Secretary of State on November 25, 2009[9].  (Debtor's Exh. C).

The Purchase Agreement closed and work commenced on June 15, 2009.  Debtor made four of the six required $10,000.00 payments as required by the Promissory Note then made no further payments.  Debtor also failed to commence monthly payments on December 15, 2009, on the consulting agreement.  Therefore, $710,000 of the down payment is due Assaigai and the balance of the purchase price of $2,158,317 is due YOME.

Things did not go well for Debtor during its first six months in business.  Debtor had $1,206,000 in total revenues, direct costs were $705,000 (58% of revenues), overhead was

---

[9]This filing was within 90 days of the bankruptcy petition. Assagai claims that this was a preferential transfer.  Debtor has not made any attempts to get this lien released or explain why it has not done so.

Page -11-

$237,000, and general and administrative expenses were $595,000 resulting in a net loss of $331,000 for the period. Exh. 9.

January was worse. Debtor had $64,000 in total revenues, direct costs were $62,000 (96% of revenues), overhead was $11,000, and general and administrative expenses were $79,000 resulting in a net loss of $88,000 for the period. Exh. 9.

On January 12, 2010 Assaigai sent Debtor a notice of default. (Objection to Debtor's Motion to Reject Equipment Lease Agreement with American Radiation Services, Inc., Doc 55, exh. C.) Debtor filed a Chapter 11 proceeding on January 29, 2010. Debtor remained as a debtor-in-possession. 11 U.S.C. § 1107(a).

Debtor's Initial Report, exh. 9, disclosed $5,000 in bank deposits and accounts receivable of $647,854. On February 17, 2010, Debtor filed a Motion for Approval of Agreement for DIP secured financing, for use of cash collateral, providing adequate protection, for modification of stay, and to assume executory contract with ARSI. Both Assaigai and creditor First Community Bank filed objections. Debtor never pursued the motion any further and no order has been entered approving or denying the motion.

Debtor had 29 employees at the beginning of this case. Exh. 6, p. 6. DeArmand testified that the Debtor was currently operating, but only to finish up work that was on hand in May. Currently Debtor has 4 employees. Exhibit 5 is a letter Debtor

sent to all its customers on or about April 15, 2010 informing them that Debtor was not taking any new work after May 1, 2010. DeArmand testified that the current budget was $-0- for revenues, and costs of about $20,000 per month for wages (including tax burden), $5,000 to $6,000 per month utilities, and whatever the attorneys were charging. His testimony omitted rent of about $20,000 and $3,000 common area charges. This projection admits a net projected loss of $48,000 per month plus attorney's fees.

DeArmand testified about the extent of Debtor's assets. Accounts receivable as of the end of June were about $514,000. He did not know how much of them were collectible[10]. He thought some of the $514,000 had been paid to Assagai prepetition. He admitted that Debtor owed Assagai money, but did not know how much. He admitted the existence of the Asset Purchase Agreement and its $2.9 million price[11]. When asked if Debtor owed $2.86

_____

[10]DeArmand claimed that he did not know because Assagai had locked Debtor out of its accounting system. This subject is discussed in greater detail below.

[11]Debtor's liability under the Asset Purchase Agreement is not on the bankruptcy schedules. Exh. 10. Assagai is listed only as an unsecured creditor in the amount of $125,000 with no explanation of the nature of the debt or the date incurred. Assaigai, YOME and the Biavas are listed on Schedule G as executory contracts. DeArmand stated that the debt was not listed because 1) it was disputed, 2) the balance due was for the consulting agreement but no services had yet been performed, and 3) he did not see a way to account for it on the books. However, other testimony presented explained that the consulting agreement was basically a cover by which the bulk of the purchase price would be paid, that no services were ever to be performed, and
(continued...)

Case 10-10373-s7   Doc 81   Filed 07/21/10   Entered 07/21/10 13:50:38 Page 13 of 35

million to Assagai DeArmand responded that it was disputable, but "yes." He also admitted that Debtor paid only a few months of the down payment installment note.

DeArmand testified that Debtor owned very little other property. Some lab equipment came with the Agreement, exh. 1, and is still subject to liens in the approximate amount of $570,000. The rest was leased from ARSI. But, Debtor filed a motion to reject this lease on May 10, 2010. Doc. 45. Debtor owns nothing else.

DeArmand testified that during the Chapter 11, Debtor had borrowed funds from ARSI. He did not know the amounts or the dates of the loans.

Debtor was past due on rent payments and common area charges for the business space in the amount of $92,000.00 when the bankruptcy was filed. From the filing to the end of June, 2010, Debtor missed five more rent payments of $20,000.00 per month plus approximately $3,000.00 per month of common area charges.

Before the bankruptcy and, to some extent, after the bankruptcy, checks paying for work done by Debtor on contracts entered into by Assaigai were made payable to Assaigai. This was contemplated by the Agreement. The parties had intended to

---

[11](...continued)
that the overall agreement was structured this way for tax reasons (consulting services could be expensed). The Court finds this to be a serious, material omission.

account to each other on a regular basis but that never really happened.  Consequently, as time passed, Debtor lost track of its accounting.  In fact, late in 2009, Elvin Chavez asked Assagai's president William P. Biava[12] to show him how to operate the accounting system.

The operating reports on file show that Debtor is not profitable.  Exhibit A, attached hereto, is a compilation of the Debtor's monthly operating reports ("MOR") for February, 2008 to May, 2008 (Exh. 6-8 and 22) rounded to the nearest $100.

The top portion of Exhibit A is a monthly income statement with the rightmost column a cumulative income statement for the Chapter 11.  The Court has adjusted the figures reported on the MOR to reflect the testimony that Debtor has not been accruing rent or common area space.  No months were profitable.  The cumulative loss for the Chapter 11 period is $(319,500).  The Exhibit shows that direct costs were 73% of revenues.  General and administrative costs were 55% of revenues.

The middle portion of Exhibit A shows the accounts receivable at the end of each month.  They dropped every month. During the Chapter 11 they dropped a total of $107,600.

_____

[12] Three Biavas own Assaigai and YOME: William P. Biava, the CEO of Assaigai; his brother John A. Biava; and John's son John W. Biava, who is essentially the information technology manager for Assaigai.  William Biava and John W. Biava testified at trial.

Accounts payable increased every month. This means that Debtor was incurring more expenses every month than it paid. The bottom portion of Exhibit A shows the amount that the accounts payable increased every month. The opening figure for January 31, 2010 accounts payable ($691,400) appears on Exh. 9, the Initial Report. Again, because Debtor was not accruing rent or common area charges of $23,000 per month, this amount was added. Exhibit A shows that payables increased $333,700 during the Chapter 11.

In summary, Exhibit A shows a substantial and continuing loss to and diminution of the estate. The Debtor is losing money and funding the losses by living off the accounts receivable and incurring debts beyond its ability to pay on a monthly basis. Debtor did not offer an accountant or other expert to contradict these findings.

Debtor presented an outline of a plan in an attempt to demonstrate that it could rehabilitate itself. See Debtor's Exh. I (Reorganization Plan Outline) and J (Reorganization Projections).

To begin with, DeArmand testified that stock will be retained by the owners under the plan; that is, ARSI would retain 80% and Chavez would retain 20%.

The Plan anticipates three phases. During phase 1, Debtor would start accepting samples again and ship them to outside labs

for processing and then report the results to customers.  Debtor
would also process some samples with existing equipment.  This
phase lasts six to nine months, but the projection on Exh. J is
for nine months.

During phase 1, Debtor starts with no equipment to process
its own samples.  Therefore, Debtor has to obtain equipment;
hence the $49,500 equipment note.  The Court suspects that Debtor
is rejecting the equipment lease with ARSI with the intent of
leasing it again later.  Otherwise, there was no testimony that
Debtor could obtain financing or that the amount borrowed would
be adequate to equip a laboratory.  Second, William Biava
testified credibly that this business model for a laboratory –
brokering the testing work – is simply not profitable because the
gross profit margins on testing are barely enough to pay costs.
The plan projection for phase 1, which lasts nine months, bears
this out.  Phase 1 anticipates $600,000 of revenue and expenses
of $594,628, for a net profit of $5,372.  However, the budget for
phase 1 includes nothing for insurance, nothing for lab equipment
repair or maintenance, and nothing to pay for disposal of lab
waste.  It also does not mention that Debtor will incur costs for
moving its premises.  The Plan later states that Debtor will
retain key staff members, yet it budgets only $125,000 for
salaries and $25,000 for payroll taxes for nine months.  DeArmand
testified that the current budget (when little or no work going

Page -17-

on) was $20,000 per month for wages (including tax burden).
$125,000 for nine months combined with an increase in business
activities seems unrealistic.  Next, Debtor's projection for
subcontract analytical services and freight and delivery are
$300,000 and $10,000 respectively.  If these are the only direct
costs, they are only 51% of revenues.  Debtor has never had such
a low direct cost figure.  For Debtor's 2009 operations it had a
58% direct cost and for January, 2010 it had a 96% direct cost.
Exhibit A, which consists of a period where Debtor was doing its
own work and not shipping out, had direct costs of 73%.  If the
projections are correct, Debtor would be better off shipping
everything out instead of trying to get back into doing its own
work.

During phase 2, Debtor would bring its equipment online and
begin operations providing a limited number of tests to customers
and continuing to ship other samples to outside labs and process
samples with existing equipment.  This phase lasts six to nine
months but the projection is for nine months.  Phase 2 projects
revenue of $750,000, expenses of $684,500 and net profit of
$65,600.  There is no provision for income taxes[13].  Revenues

_____

[13]Debtor had accumulated net operating losses ("NOL"s) of
$393,000 by the time it filed for Chapter 11 relief.  While
bankruptcy generally does not result in forgiveness of debt
income, it does result in reductions of certain tax attributes
including NOLs.  26 U.S.C. § 108(b).  Therefore, confirmation of
Debtor's plan would likely wipe out the NOL carryforward.

Page -18-

jump by 25%, which seems high without any further explanation.
Subcontract services drop to $200,000. The direct costs seem to
be unrealistically low: subcontract of $200,000, freight of
$15,000, lab supplies of $20,000 and perhaps some wages. The net
profit margin is 8.73%.

During phase 3, Debtor would regain its status as a full
service chemistry laboratory and return to processing samples in
its own laboratory. Some samples will be shipped to outside labs
for tests not able to be run on existing equipment. This final
phase is supposed to return Debtor to its former position in the
market place. The associated projection is for one year. Phase
3 projects revenue of $1,200,000, expenses of $1,138,000 and net
profit of $62,000. There is no provision for income taxes. The
plan anticipates Debtor moving into a much larger facility during
this time, but provides no expense for the move or tenant
improvements (if any). Revenues jump by 20%,[14] which seems high
without any further explanation. The net profit margin drops to
5.16%.

Under the Debtor's projections, Debtor will profit (before
tax) a total of $132,872 in 30 months of operation. While the
Court realizes this proceeding is not a confirmation hearing, the
draft Plan presented by Debtor seems to be total gossamer based

_____

[14]Phase 2 was only 9 months long. Phase 2 revenues of
$750,000 annualize to $1,000,000. Phase 3 is therefore a 20%
rise.

only on hopes of what might be. This Debtor has never been profitable. Doing a projection that suddenly shows a drastic turnaround without any convincing evidence that it is possible does not translate into actual profitability in the real world[15]. The bottom line is that Debtor started up its business with insufficient capital[16], then did not get a lucrative government contract that it hoped for[17], and then the economy went down. The Court finds the plan not feasible and, as discussed below in the Conclusions of Law section, unconfirmable.

When Debtor did not pay the $750,000 down payment, Assaigai was unable to and did not deliver the release of liens under the Agreement. Nor did Assaigai move from the premises it had been sharing with Debtor. To this date both Assaigai and Debtor share the building, a phone system and a networked computer system.

---

[15]        [P]rojections of the income necessary to
            finance a plan of reorganization must be
            based on concrete evidence of financial
            progress and must not be speculative,
            conjectural or unrealistic.
Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.), 419 B.R. 81, 90 (Bankr. S.D. Ga. 2009)(citing In re Fort Knox Mini Warehouse. Inc., 2002 WL 1842452, at *6 (Bankr. N.D. Iowa 2002)).

[16]Debtor's insistence that Assaigai finance the initial down payment of $750,000 suggests that Debtor was trying to leverage itself as much as possible while risking the least amount possible.

[17] Witnesses discussed a potential valuable contract that LANL was about to let out for bidding. The contract was not opened for bidding until a year later than expected and then LANL did not accept any bids.

All mail goes to one reception area. Assaigai has computer access to view all of Debtor's transactions. It is unclear to the Court if Debtor has reciprocal access and if it does, whether anyone at Debtor has the knowledge to do so. And, they are both very angry.

Debtor attempted to establish "unusual circumstances" that would justify denial of a motion to dismiss or convert. First, DeArmand suggested the possibility that mail had been intercepted. There was no proof of this. DeArmand also suggested the possibility of Assaigai agents listening into Debtor's phone calls or answering calls meant for Debtor. Again, there was no proof offered on this issue. Finally, DeArmand tried to prove that Assaigai interfered with Debtor's access to the computer network post-petition. When questioned, however, he testified that he only knew about the interference from the accounting manager and that when they checked the problem they determined it was not caused by Debtor's computers. He assumed it was Assaigai's fault. He never told Assaigai of the problem and did not know if anyone else told Assaigai either. He finally testified that he really just did not know the cause.

John W. Biava, an engineer and vice president at Assaigai, is responsible for the computer systems at Assaigai, including

remote access through a VPN[18].  The computers keep security logs,
which William Biava reviewed and testified about at the trial.
In January, Assaigai became concerned with the security of its
data[19] so it turned off the VPN until it could be reassured that
Debtor would not tamper with the data.  This was resolved and the
new VPN user account password was given back to Debtor.  There
had been a 3 to 7 day lapse in allowing outsiders (*i.e.*, the
Louisiana personnel) into the system.  Local access was not
impacted.  And, as far as John Biava knew Debtor had continuous
access after that time with one exception.  On May 27, 2010, one
R. Burford, employee of ARSI, was online through the VPN deleting
the accounts for all the employees that were no longer at Debtor.
Unfortunately, Burford apparently deleted many other accounts as
well.  No one at Assaigai knew of this, nor did anyone tell them
until it came out at this trial on June 24, 2010 at which point

---

[18] "VPN" is an acronym for "virtual private network", which
is "a network that uses a public telecommunication
infrastructure, such as the Internet, to provide remote offices
or individual users with secure access to their organization's
network [as if the user were accessing the database on site]".
SearchEnterpriseWAN.com, last accessed July 20, 2010 at 4.49 pm
(MDT).  Debtor's accounting was mostly done at ARSI's facilities
in Louisiana.  This was possible through the VPN link to the
Albuquerque servers.

[19]After Assaigai made the demand on Debtor the tenor of
their relationship changed for the worse.  The unrebutted
testimony of William Biava was that there was good reason to
believe that Debtor was about to abscond with the backup server
and probably other equipment as well.  Police were called;
landlord liens were filed.  The server and other equipment remain
at the site.

it was promptly remedied by Assaigai. Other than this, John Biava believed Debtor had continuous access from January to June. The Court finds Assaigai's version of the events to be more credible than Debtor's version which is mostly based on unverified assumptions.

## CONCLUSIONS OF LAW

Assaigai filed its Motion to Convert under 11 U.S.C. § 1112(b) citing a) substantial and continuing losses to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, b) gross mismanagement of the estate, and c) failure to pay post-petition taxes. Assaigai abandoned the third ground at trial, conceding that Debtor had paid its taxes. Section 1112, **Conversion or dismissal,** provides in relevant part:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3)[20], on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this

---

[20]**§ 1104. Appointment of trustee or examiner**
(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

Page -23-

chapter, whichever is in the best interests of
creditors and the estate, if the movant establishes
cause.
(2) The relief provided in paragraph (1) shall not be
granted absent unusual circumstances specifically
identified by the court that establish that such relief
is not in the best interests of creditors and the
estate, if the debtor or another party in interest
objects and establishes that--
    (A) there is a reasonable likelihood that a plan
    will be confirmed within the timeframes
    established in sections 1121(e) and 1129(e) of
    this title, or if such sections do not apply,
    within a reasonable period of time; and
    (B) the grounds for granting such relief include
    an act or omission of the debtor other than under
    paragraph (4)(A)--
        (I) for which there exists a reasonable
        justification for the act or omission; and
        (ii) that will be cured within a reasonable
        period of time fixed by the court.
(4)  For purposes of this subsection, the term 'cause'
includes--
    (A) substantial or continuing loss to or
    diminution of the estate and the absence of a
    reasonable likelihood of rehabilitation;
    (B) gross mismanagement of the estate; ...

In In re Modanlo the Bankruptcy Court for the District of

Maryland described the process for a court to decide a motion to

convert under the current version of Bankruptcy Code § 1112:

> The mechanics of determining whether a
> court should convert or dismiss a case under
> the post-BAPCPA version of 11 U.S.C. §
> 1112(b) appear to be as follows: First, the
> movant must demonstrate that cause exists by
> a preponderance of the evidence.  At this
> point, if cause has been demonstrated, the
> court must ascertain whether unusual
> circumstances exist to prevent conversion or
> dismissal.  If no such unusual circumstances
> exist, the court must convert or dismiss.
> The non-moving party is able to try to defeat
> a motion to convert or dismiss the bankruptcy
> case by showing that unusual circumstances

Case 10-10373-s7   Doc 81   Filed 07/21/10   Entered 07/21/10 13:50:38 Page 24 of 35

> exist to prevent dismissal or that factors
> specifically set out in § 1112(b)(2)(A) and
> (B) exist (<u>e.g.</u>, reasonable likelihood of
> timely confirmation, reasonable excuse for an
> omission by the debtor).  If these exist, the
> opponent to the motion to convert or dismiss
> prevails, unless the court determines that
> the best interests of the estate are
> otherwise.  And, the court must make this
> best interests assessment even if the
> opponent does not carry its burden or even
> make a defense.  Thus, if cause has been
> demonstrated (and whether or not the motion
> is opposed), the court must ascertain whether
> the best interests of creditors and the
> estate are served by granting or denying the
> motion.  <u>In re Hook</u>, 397 B.R. 544, 2008 WL
> 3906794, at *4 (10th Cir. BAP Aug. 26, 2008)
> ("[ Section 1112(b)(1) ] allows the court to
> deny the motion if doing so would be in
> furtherance of the best interests of the
> creditors or the estate.")(unpublished); <u>In
> re Orbit Petroleum, Inc.</u>, 395 B.R. 145,
> 148-49 (Bankr. D. N.M. 2008) ("In this case,
> because a plan has been filed which purports
> to pay all creditors in full as of the
> effective date ... neither conversion nor
> dismissal is in the best interest of the
> creditors of the estate.").

<u>In re Modanlo</u>, 413 B.R. 262, 271 (Bankr. D. Md. 2009)(footnote omitted).

The Court finds cause to convert the case under both § 1112(b)(4)(A) and (B).

## SECTION 1112(b)(4)(A): SUBSTANTIAL OR CONTINUING LOSS TO OR DIMINUTION OF THE ESTATE AND THE ABSENCE OF A REASONABLE LIKELIHOOD OF REHABILITATION.

To obtain relief under 11 U.S.C. § 1112(b)(4)(A), movant must show both a continuing loss or diminution and absence of a reasonable likelihood of rehabilitation.  <u>In re Fall</u>, 405 B.R.

Page -25-

863, 867 (Bankr. N.D. Ohio 2008), aff'd, 2009 WL 974538 (N.D.
Ohio 2009); Vallambrosa Holdings, 419 B.R. at 88.

Rehabilitation is more than reorganization. Fall, 405 B.R.
at 867-68. It signifies something more, such as "to put back in
good condition" or "to re-establish on a firm, sound basis." Id.
(citing In re The V Companies, 274 B.R. 721, 725 (Bankr. N.D.
Ohio 2002)). It contemplates the successful maintenance or re-
establishment of the debtor's business operations. Vallambrosa
Holdings, 419 B.R. at 89. Rehabilitation in Chapter 11 starts
with a confirmable plan. Id.

As demonstrated above, Debtor lost $319,500 in the first
four months after bankruptcy. Exh. A. DeArmand testified that
no new work was coming in after May 1, 2010. Projected future
revenues were $-0- for some indefinite future. Projected
expenses going forward would be $48,000 per month plus attorney
and reorganization fees. These all demonstrate a "continuing
loss."

Debtor's accounts receivable have declined $107,600 during
the Chapter 11. This demonstrates a "diminution".

Debtor cannot rehabilitate. As discussed above, Debtor's
plan is not feasible. It also violates the rule that

administrative claims must be paid in full upon confirmation[21]

and the absolute priority rule[22].

**<u>Administrative Claims.</u>**

---

[21]11 U.S.C. § 1129 provides, in relevant part:
(a)  The court shall confirm a plan only if all of the
following requirements are met:
(9) Except to the extent that the holder of a
particular claim has agreed to a different treatment of
such claim, the plan provides that--
    (A) with respect to a claim of a kind specified in
    section 507(a)(2) or 507(a)(3) of this title, on
    the effective date of the plan, the holder of such
    claim will receive on account of such claim cash
    equal to the allowed amount of such claim;

[22]11 U.S.C. § 1129(b) provides in relevant part:
(b)(1)  Notwithstanding section 510(a) of this title,
if all of the applicable requirements of subsection (a)
of this section other than paragraph (8) are met with
respect to a plan, the court, on request of the
proponent of the plan, shall confirm the plan
notwithstanding the requirements of such paragraph if
the plan does not discriminate unfairly, and is fair
and equitable, with respect to each class of claims or
interests that is impaired under, and has not accepted,
the plan.
(2) For the purpose of this subsection, the condition
that a plan be fair and equitable with respect to a
class includes the following requirements:...
(B) With respect to a class of unsecured claims--
    (i) the plan provides that each holder of a claim
    of such class receive or retain on account of such
    claim property of a value, as of the effective
    date of the plan, equal to the allowed amount of
    such claim; or
    (ii) the holder of any claim or interest that is
    junior to the claims of such class will not
    receive or retain under the plan on account of
    such junior claim or interest any property, except
    that in a case in which the debtor is an
    individual, the debtor may retain property
    included in the estate under section 1115, subject
    to the requirements of subsection (a)(14) of this
    section.

Page  -27-

Section 507(a)(2) grants priority to "administrative
expenses allowed under section 503(b) of this title."
Section 503(b)(1)(A) defines "the actual, necessary
costs and expenses of preserving the estate" as
administrative expenses.  The Tenth Circuit Court of
Appeals ("Tenth Circuit") has held that in order to be
treated as an administrative expense, "the expense
must: (1) arise out of a transaction between the
creditor and the bankrupt's trustee or debtor-in-
possession; and (2) benefit the debtor-in-possession in
the operation of the business."  In re Mid Region
Petroleum, Inc., 1 F.3d 1130, 1133 (10th Cir.1993)
(citing In re Amarex, 853 F.2d 1526, 1530 (10th
Cir.1988)).

Peters v. Enterasys Networks, Inc. (In re Native American

Systems, Inc.), 351 B.R. 135, 138 (10th Cir. BAP 2006).  "Such

costs and expenses encompass, without limitation, post-petition

professional fees, salaries, wages, supplies, rent, utilities and

other trade payables-all those ongoing operating and case

administration expenses that would not likely be supplied on

credit to a chapter 11 debtor without the protection of Section

507(a)'s priority scheme...."  In re Digital Impact, Inc., 223

B.R. 1, 6 (Bankr. N.D. Okla. 1998).  And, lessors are entitled to

post-petition rent under this provision in the amounts required

under their leases without proof of value or benefit to the

estate.  El Paso Properties Corp. v. Gonzales (In re Furr's

Supermarkets, Inc.), 283 B.R. 60, 65 (10th Cir. BAP 2002).

Debtor's accounts payables increased postpetition by

$241,700 (Exhibit A) and rent and common area expenses due under

Debtor's lease amounts to at least $92,000.  Together, this

$333,700 must be paid as an administrative expense under 11

Case 10-10373-s7   Doc 81   Filed 07/21/10   Entered 07/21/10 13:50:38 Page 28 of 35

U.S.C. 1129(a)(9)(A) in cash upon confirmation.  The Debtor's

plan makes no reference to this and is unconfirmable on its face.

<u>Digital Impact</u>, 223 B.R. at 6.  Furthermore, the projections

accompanying the plan show that the reorganized Debtor would

profit only $132,872 in 30 months of operation (pre-tax), more

evidence that Debtor cannot meet this requirement.

**Absolute Priority Rule.**

> The absolute priority rule requires that certain
> classes of claimants be paid in full before any member
> of a subordinate class is paid.  Under this rule,
> unsecured creditors stand ahead of investors in the
> receiving line and their claims must be satisfied
> before any investment loss is compensated.  11 U.S.C. §
> 1129(b)(2)(B)(ii); <u>Unruh v. Rushville State Bank</u>, 987
> F.2d 1506, 1508 (10th Cir. 1993).  The rule reflects
> the different degree to which each class assumes the
> risk of the debtor's insolvency.  <u>See [In re] Granite</u>
> <u>Partners [L.P.]</u>, 208 B.R. [332] at 337, 344 [(Bankr.
> S.D. N.Y. 1997)].

<u>Allen v. Geneva Steel Co. (In re Geneva Steel Co.)</u>, 281 F.3d

1173, 1180 n. 4 (10th Cir. 2002).  DeArmand testified that

shareholders would retain their interests in Debtor.  Debtor's

plan is not feasible and cannot pay unsecured creditors in full.

It violates the absolute priority rule.

**SECTION 1112(b)(4)(B): GROSS MISMANAGEMENT OF THE ESTATE.**

The Court also finds many examples of mismanagement of the

estate.  Each individual one may not be significant, but, when

taken together, they amount to a gross mismanagement.

For example, DeArmand is the Chief Operating Officer.  He

appeared at the office maybe one day per month.  Danny Coleman is

Page  -29-

the Chief Executive Officer. DeArmand was not sure Coleman ever
even came to New Mexico. Elvin J. Chavez was President of Debtor
until he resigned in March or April, 2010. There are no other
officers of Debtor. <u>Compare</u> <u>Nester v. Gateway Access Solutions,</u>
<u>Inc. (In re Gateway Access Solutions, Inc.)</u>, 374 B.R. 556, 564-65
(Bankr. M.D. Pa. 2007)("Failure to maintain an effective
corporate management team has been held to constitute gross
mismanagement.")(Citations omitted.)

In his testimony, DeArmand did not have a good grasp of
daily activities at the Debtor or the operation of the Debtor's
bankruptcy estate. Many duties were delegated and not followed
up on. For example, DeArmand did not prepare the MOR, seemed
unfamiliar with their requirements, and delegated the duty to
fill them out to someone in Louisiana. He could not state for a
fact that they were accurate, and he did not know when they were
filed, or why they were filed late, or when the next ones would
be filed. <u>See</u> <u>id.</u> at 565. ("The Court believes that accurate
reporting and financial transparency are important requirements
in the management of a debtor-in-possession.")

DeArmand did not know the amount of the accounts receivable
that were collectible. The Court therefore deduces that no one
is working the collectibles. Evidence at trial established that
Debtor has not invoiced LANL for work it did on an Assaigai
contract since October in an amount probably over $200,000. <u>See</u>

Page -30-

<u>Fall</u>, 405 B.R. at 869 (failure to pursue accounts receivable is
mismanagement).  He did not know the amounts of receivables that
had been collected by Assaigai or recite any attempts he had made
since the bankruptcy filing to reconcile the amounts other than
an adversary proceeding that Debtor filed but appears presently
stalled.

DeArmand knew that a Motion to Borrow was filed to
legitimize transfers between Debtor and ARSI, but did not follow
up on whether any order was actually entered allowing it.  He saw
no problem with borrowing as needed from ARSI.  He knew loans
were made, but did not know when or how much, but "maybe" over
$100,000.  <u>See</u> <u>Gateway Access Solutions</u>, 374 B.R. at 566
(Unapproved, unauthorized corporate borrowings on oral terms is
evidence of gross mismanagement.)

After the bankruptcy DeArmand "or someone else" authorized
an offset of $91,371 of debts with ARSI without notice to
creditors or Court approval.  Exh. 8, p.8.  He did not know if
the offsets involved pre- or post-petition transactions and did
not believe it was improper.  The offset was done to "clean up"
the books.  The Debtor has made no disclosure of any actions that
will or will not be taken regarding the allegedly preferential
transfer to ARSI in December, 2009.  It would be in the
creditors' best interests to have all of these transactions
reviewed by a trustee.  This may be sufficient cause in itself to

convert or appoint a trustee.  See Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.), 838 F.2d 1133, 1136 (10th Cir. 1988).

At trial, DeArmand accused Assaigai of interfering with their computer systems to such an extent that Debtor could not determine its financial status and claimed that Debtor's employees were "locked out."  As discussed above, the Court finds that this simply did not happen.  It is Debtor's own fault that it cannot determine its financial condition.

Other examples of mismanagement include the Debtor's failure to account for post-petition rent, failure to list the liability for the Consulting Agreement on its books or bankruptcy schedules, and Debtor's apparent lack of understanding[23] of what assets it owned[24], leased, or used.  Debtor has no IT department.

Finally, after six months in bankruptcy, the Court and creditors do not have a clear picture of Debtor's financial affairs.  This is a ground to convert the case.  Fall, 405 B.R. at 869 (citing Gateway Access Solutions, 374 B.R. at 565.)  See also In re Vaughan, 429 B.R. 14, 29-30 (Bankr. D. N.M.

---

[23]DeArmand testified that he did not know if Debtor's Schedule B was accurate.  He stated that no leased assets appeared on Schedule B then said he was not sure.  He knew some assets had liens but did not know the amount owed or the creditor.

[24]On its original schedules, Debtor listed ownership of various assets that appear on the Debtor's Motion to Reject Lease with ARSI.

Page  -32-

2010)(collecting cases that find that accurate disclosure is a

fundamental duty of a debtor-in-possession.)

Therefore, Assaigai has met its burden of proof of showing

cause to convert the case under both 11 U.S.C. § 1112(b)(4)(A)

and (B).

> Once "cause" has been demonstrated, the Court must
> convert or dismiss, unless the Court specifically
> identifies "unusual circumstances ... that establish
> that such relief is not in the best interest of
> creditors and the estate." 11 U.S.C. § 1112(b)(1).
> However, absent unusual circumstances, the Court must
> not convert or dismiss a case if (1) there is a
> reasonable likelihood that a plan will be confirmed
> within a reasonable time, (2) the "cause" for dismissal
> or conversion is something other than a continuing loss
> or diminution of the estate coupled with a lack of
> reasonable likelihood of rehabilitation; and (3) there
> is reasonable justification or excuse for a debtor's
> act or omission and the act or omission will be cured
> within a reasonable time. 11 U.S.C. § 1112(b)(2); 7
> Collier on Bankruptcy ¶ 1112.04 [1] (Alan N. Resnick
> and Henry J. Sommer, eds., 15th ed. rev. 2008).

In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D. N.M.

2008)(footnote omitted.)

The Courts finds no unusual circumstances that establish

that the requested conversion or dismissal is not in the best

interests of creditors and the estate[25]. Debtor attempted to

prove that all of its problems were caused by Assaigai but failed

---

[25]This section of the opinion is addressed only to the
finding of mismanagement. The "unusual circumstances" exception
does not apply to cases involving continuing loss or diminution
of the estate coupled with a lack of reasonable likelihood of
rehabilitation. See 11 U.S.C. § 1129(b)(2)(B) ("the grounds for
granting such relief include an act or omission of the debtor
other than under paragraph (4)(A).")(Emphasis added.)

to prove anything other than a contract dispute (subject to arbitration).  This is not unusual.  Therefore, under 11 U.S.C. § 1112(b)(1) the Court "shall" convert or dismiss the case unless § 1112(b)(2) applies.

The conditions set out in Section 1112(b)(2) are not present.  There is no likelihood that a plan will be confirmed with a reasonable period of time.  This takes Section 1112(b)(2)(A) out of the picture.  Section 1112(b)(2)(B) requires both a reasonable justification for the act or omission and a cure of the act or omission within a reasonable period of time fixed by the court.  Debtor did not offer any remedial measures to cure the management failures or lack of information.  Thus the standard of Section 1112(b)(2)(B) is also not met.  Therefore Section 1112(b)(2) does not prevent the Court from converting the case.

Finally, the Court finds that conversion as opposed to dismissal is in the best interests of the creditors.  The record shows that there are accounts receivable to be collected.  If Assaigai is correct in asserting that ARSI's lien was preferential, a Chapter 7 trustee could avoid that lien, preserve it for the benefit of the estate and pursue collecting the receivables.  The case would also benefit from a Chapter 7 trustee reviewing the transactions that have taken place with

Case 10-10373-s7    Doc 81    Filed 07/21/10    Entered 07/21/10 13:50:38 Page 34 of 35

ARSI since the Debtor was formed, particularly the post-petition offset.  Therefore, the Motion to Dismiss will be denied.

Orders consistent with this Memorandum Opinion will be entered separately.

_____
Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  July 21, 2010

Copies to:

George M Moore
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

Bonnie Gandarilla
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

Alice Nystel Page
PO Box 608
Albuquerque, NM 87103-0608

Paul M Kienzle, III
PO Box 587
Albuquerque, NM 87103-0587

Marcus E. Garcia
Garcia Law Firm, P.C.
20 First Plaza Ctr. NW, Suite 717
Albuquerque, NM 87102

David T Thuma
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309